**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------

NORTHWELL HEALTH, INC.,

                             Plaintiff,

        v.

LEXINGTON INSURANCE COMPANY and
INTERSTATE FIRE & CASUALTY COMPANY.

                             Defendants.

---------------------------------------------------------

:   Civil Action No.
:
:
:   **COMPLAINT**
:
:   **JURY TRIAL DEMANDED**
:
:
:
:

      Plaintiff Northwell Health, Inc. ("Northwell" or "Plaintiff"), by and through its undersigned attorneys, as and for its Complaint against Lexington Insurance Company ("Lexington") and Interstate Fire & Casualty Company ("Interstate," together with Lexington "Defendants"), alleges as follows:

<b><u>INTRODUCTION</u></b>

      1.    This diversity action for breach of contract, declaratory relief, and breach of the covenant of good faith and fair dealing arises out of Defendants' refusal to provide insurance coverage under an "all risk" property policy for Northwell's significant property and business interruption losses and decontamination costs arising out of the novel coronavirus outbreak and ongoing COVID-19 pandemic. Despite issuing broad property and business interruption insurance policies that expressly include coverage for Interruption by Communicable Disease, Defendants have refused to compensate Northwell for its losses.

      2.    The State of New York, and more specifically the New York City metropolitan area, was the hardest hit area in the early stages of the COVID-19 pandemic in the United States. By the end of March 2020, New York was reporting more than 15,000 confirmed cases, with that number doubling every three to four days. By mid-May 2020, New York had more than 375,000

confirmed cases and more than 27,500 deaths, representing nearly one out of every three COVID-19 deaths in the country.  New York has since experienced multiple waves of COVID-19, and as of January 2021 has had over 1.3 million confirmed cases.

3.      Northwell is New York State's largest health care provider and private employer, with numerous hospitals and outpatient facilities.  As of mid-July 2020, Northwell's health system had cared for more COVID-19 patients than any other organization in the United States.  Northwell has been inundated with COVID-19 patients, and the coronavirus has been present in Northwell's facilities since the onset of the pandemic.

4.      Northwell has more than 75,000 employees, including more than 18,500 nurses and more than 4,500 employed physicians as part of more than 14,200 physicians providing care at its facilities.

5.      This map from Northwell's fact sheet shows the location of Northwell's facilities around the New York metropolitan area:



6.      Given the wide spread of coronavirus and Northwell's status as a healthcare provider, virtually all of those dots (and especially the 23 Hs) represent a building in which coronavirus comes walking in the door every single day.  Undeniable, the coronavirus was and remains present in the air and on surfaces.

7.      All of Northwell's employees have been on the front lines to contain COVID-19's spread and save the lives of New Yorkers, administering tests, monitoring those infected but not requiring hospitalization, and doing everything in their power to heal those requiring inpatient treatment in hospital rooms or intensive care units, whether by providing direct medical care or the administrative facilities support.

8.      While devoting resources to combat this unprecedented healthcare crisis, including mounting costs to clean and disinfect its premises, Northwell has simultaneously suffered significant business interruption losses, including but not limited to losses from the suspension of Northwell's non-essential operations and reduction of revenue for procedures deemed elective. Northwell's costs and losses are due not only to the numerous and evolving mandates from local, state and federal authorities as to how to clean its facilities, but also to the actual presence of COVID-19 at Northwell's premises, and the orders issued in response to the COVID-19 crisis, many of which have expressly recognized that COVID-19 causes direct physical loss of and/or damage to property (the "Orders").

9.      The Orders, most of which have been renewed and extended multiple times, have devastated Northwell's business.  The suspension of Northwell's business includes the suspension of ambulatory physician practices and the cessation of medical procedures described as elective. Although to a layperson the term "elective" may imply that the procedures are less serious, in the medical community the term "elective" simply means any procedure that can be scheduled in

advance. Thus, the suspension of Northwell's business activities includes a wide variety of procedures, some of which are anything but a matter of choice.

10.     As a health care system, Northwell had the foresight to insure against the risks posed by pandemics that can impose a crippling strain on hospitals, medical facilities, and their workers. More specifically, in exchange for a substantial premium, Northwell purchased property insurance from Defendants that covers "all risks." The policies issued by Defendants (the "Policies") provide a total of $1.25 billion in coverage, with Lexington covering 90% and Interstate covering 10% on a proportionate share basis. Among other things, the Policies provide coverage for:

- Loss resulting from the interruption of Northwell's normal business operations;

- Loss caused by restriction of access to property, including specifically if caused by an order issued by a civil authority;

- Loss caused by communicable disease;

- Costs to clean and decontaminate Northwell's premises; and

- Extra expenses incurred to continue Northwell's business as nearly normal as practicable.

11.     Northwell has experienced costs and losses that fall within the Policies' coverage as the presence of the coronavirus and the resulting COVID-19 disease have caused direct physical loss of and/or damage to Northwell's property covered by the Policies.

12.     Relying on its "all risk" insurance, Northwell promptly notified Defendants and made a claim for coverage under the Policies. Northwell provided documentation of its hundreds of millions of dollars of covered costs and losses, answered other requests for information, and waited for months with no decision on the claim from the Defendants.

13.     In this time of crisis, Defendants rebuffed Northwell's claim.  After delaying for more than six months, on October 30, 2020, Defendants notified Northwell of their determination denying Northwell's claim in its entirety.  Among other things, Defendants stated that the Interruption by Communicable Disease and Decontamination Cost coverage Northwell bargained and paid for was unilaterally erased by a "pollution" exclusion endorsement and that no other coverages were available.

14.     Defendants' position contravenes the plain meaning of the coverage language and case law in New York and across the country interpreting the same or similar pollution exclusions. Moreover, in direct contrast to other policies in the marketplace, the Policies expressly contain coverage for communicable diseases, confirming that the presence of a virus can cause loss of or damage to property.

15.     Defendants have refused to pay any amounts to Northwell to date.  As a result, Northwell brings this action for breach of contract and declaratory judgment that it is entitled to the full amount of all risks coverage for its costs and losses, and for breach of the covenant of good faith and fair dealing due to Defendants' knowing or reckless obfuscation of Northwell's covered claim without a reasonable basis.

## THE PARTIES

16.     Plaintiff Northwell is a not-for-profit corporation organized under the laws of New York with its principal place of business in New Hyde Park, New York.

17.     Upon information and belief, Defendant Lexington is a Delaware corporation with its principal place of business in Boston, Massachusetts.  Upon information and belief, Lexington is duly authorized to conduct insurance business in the State of New York.  Upon information and belief, Lexington, at all material times, has conducted business within the State of New York,

including engaging in the business of selling insurance, investigating claims, and/or issuing policies that cover policyholders, property, or activities located in New York.

18.     Upon information and belief, Defendant Interstate is an Illinois corporation with its principal place of business in Chicago, Illinois.  Upon information and belief, Interstate is duly authorized to conduct insurance business in the State of New York.  Upon information and belief, Interstate, at all material times, has conducted business within the State of New York, including engaging in the business of selling insurance, investigating claims, and/or issuing policies that cover policyholders, property, or activities located in New York.

<b><u>JURISDICTION AND VENUE</u></b>

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties to this action and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

<b><u>FACTUAL ALLEGATIONS</u></b>

**I.      <u>The Coronavirus Outbreak</u>**

21.     In December 2019, during the term of the Policies, an outbreak of an illness known as COVID-19 caused by a novel coronavirus formally known as SARS-CoV-2 was first identified in Wuhan, Hubei Province, China.  In an event that has not occurred in more than a century, a pandemic of global proportions then ensued, with the virus spreading quickly to Europe and then to the United States.

22.     From the first reported case in the United States in January 2020 to the present, the impact of the coronavirus and resulting COVID-19 disease has been staggering on life and

property.  And, specifically, the impact on health care systems who have been on the front line, such as Northwell, has been particularly acute.

23.     As of February 26, 2020, the Centers for Disease Control and Prevention ("CDC") warned that community transmission of the disease existed in the United States.  The coronavirus was spreading with no ability to trace the origins of new infections.[1]  Moreover, the nature of the novel coronavirus that causes COVID-19 has made its containment particularly challenging.  Numerous scientific studies and articles have identified that the virus can spread when droplets from an infected person land on objects and surfaces and then, after contact with the infected objects and surfaces, other individuals touch their eyes, nose, or mouth.[2]

24.     Coronavirus has several modes of transmission.  Indeed, according to the CDC, "everyone is at risk for getting COVID-19."  Per the CDC and World Health Organization (the "WHO"), a person may become infected by: (1) coming into close contact (about 6 feet) with a person who has COVID-19; (2) absorbing respiratory droplets when an infected person talks, sneezes, or coughs; or (3) touching surfaces or objects that have the virus on them and then touching his or her mouth, eyes, or nose.  Thus, the coronavirus is present both in fluid particles in the air, and on surfaces.

25.     Northwell's hospitals and medical facilities are particularly susceptible to circumstances favorable to the spread of the virus.  Given the influx of COVID-19 patients seeking

---

[1] *CDC Confirms Possible Instance of Community Spread of COVID-19 in U.S.*, CDC Newsroom, *available at* https://www.cdc.gov/media/releases/2020/s0226-Covid-19-spread.html.

[2] *See, e.g.*, *See How Easily COVID-19 Might Spread Through A Restaurant In This Black Light Experiment* (May 16, 2020), *available at* https://www.kxan.com/news/coronavirus/see-how-easily-covid-19-might-spread-through-a-restaurant-in-this-black-light-experiment/; *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-2*, (April 16, 2020), *available at* https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

medical attention at Northwell's facilities, Northwell's costs to sanitize its facilities and ensure the safety of its patients and the health care workers who treat them have risen dramatically.

26.     COVID-19 is not only highly contagious but deadly.  According to the CDC, more than 24 million Americans have contracted the disease, of which more than 400,000 have died.

27.     Besides being deadly, the virus is challenging to contain because infected individuals can be asymptomatic—and thus unaware that they might be spreading the virus through the mere touching of objects and surfaces.  Studies have estimated that more than 40% of infected individuals may never develop any symptoms.[3]  But even individuals who appear healthy and present no identifiable symptoms of the disease will still spread the virus by merely breathing, speaking, or touching objects and surfaces.

28.     The virus also continues to evolve, making it more difficult to contain.  In late December 2020, a new strain of COVID-19 was detected, which is believed to be more contagious and easily spread, and its presence has been confirmed in New York.  Early research also suggests the new strain may be resistant to antiviral treatment, making it more dangerous.

## II.     Coronavirus Causes Direct Physical Loss of or Damage to Property

29.     The United States reported its first COVID-19 case on January 20, and on January 30, the WHO declared the pandemic a "Public Health Emergency of International Concern."  On March 13, 2020, the federal government declared a national emergency.  Three days later, the CDC and members of the national Coronavirus Task Force issued public guidance, styled as "30 Days to Slow the Spread," that advocated for the first time far-reaching social-distancing measures.

---

[3] Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected*, NBC News (May 27, 2020, 12:43 PM), https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-may-be-more-commonsuspected-n1215481.

30.     By mid-March, it became clear that drastic action had to be taken to slow down the rate of infections.  Many states and local governments then began to impose sweeping restrictions on residents' daily lives and property to protect them and stop the spread.[4]  Most states restricted or prohibited the operation of non-essential business or required individuals to stay at home except for essential purposes.

31.     New York, where Northwell's properties are located, declared a state of emergency to limit the spread of the virus that was causing direct physical loss of or damage to property.  It issued Orders suspending or severely curtailing the operations of all non-essential or high-risk business and permitted residents to leave their homes only for limited purposes, such as for groceries and to perform essential jobs.  These Orders have directly impacted Northwell's business.

32.     For example, New York Mayor Bill De Blasio signed a series of stay-home orders and explained that these drastic measures were needed because of the unique characteristics of the novel coronavirus and, of particular relevance here, stating that "the virus physically is causing property loss and damage[.]"  On March 22, 2020, New York Governor Andrew Cuomo issued the "New York State on PAUSE" executive order, ordering the closure of all non-essential businesses and prohibiting non-essential gatherings.  This order has been extended since its initial issuance, and the Governor, the City of New York, and counties in New York in which Northwell operates have issued similar orders and orders bearing directly on healthcare providers.  Similar executive orders have been issued by state and municipal governments across the country and have been renewed and amended.

---

[4] Jasmine C. Lee et al., *See How All 50 States Are Reopening (and Closing Again)*, N.Y. Times (updated July 31, 2020), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html.

33.     The Orders have declared portions of Northwell's properties uninhabitable due to the threat of the spread of COVID-19 and prohibited access to those portions of Northwell's covered properties.

34.     The Orders have also resulted from the physical loss of or damage to property not owned, occupied, leased or rented by Northwell within 5 miles of Northwell's covered properties, which have the presence of COVID-19 and SARS-CoV-2.

35.     Finally, the presence of COVID-19 and SARS-CoV-2 at Northwell's covered properties has caused and is continuing to cause physical loss of or damage to Northwell's properties.

36.     Although droplets carrying the virus are not visible, they are nonetheless physical objects, carrying a physical substance, that attach to and cause harm to property.  Studies have shown that the virus can survive on a whole range of surfaces, including stainless steel, wood, paper, plastic, glass, ceramic, cardboard, and cloth.

37.     And unlike many other viruses that are unable to survive for long periods of time outside the body, the novel coronavirus is resilient and survives on surfaces for days and even weeks.  The virus thus compromises the physical integrity of the structures it permeates and poses an imminent risk of physical loss of or physical damage to all other structures.  The virus likewise renders such structures unusable.

38.     The WHO has specifically identified health care settings as a setting where there is an increased chance of transmission due to the virus' ability to infect people who come in contact with surfaces with the virus and through certain medical procedures performed on COVID-19

patients.[5]  For this reason, the WHO has stated that extra precautions must be taken in health facilities.

### III.  Northwell's Costs and Losses

39.    When the pandemic arrived in the New York area, Northwell responded to meet it and treat the pandemic's patients.

40.    Northwell faced an enormous amount of cases in the weeks after the pandemic arrived in earnest.  By March 20, the ICU of Northwell's Long Island Jewish Medical Center in Queens – just one of Northwell's many facilities affected by the pandemic – was overflowing.

41.    In addition to the tireless efforts of its employees, Northwell transformed its facilities and operations to meet this threat, creating more than 1,600 beds, securing personal protective equipment, and ensuring it had necessary staff ready around the clock.

42.    During the course of the pandemic, Northwell has taken care of more than 100,000 patients diagnosed with COVID-19.

43.    Northwell has incurred significant costs and losses caused by the coronavirus pandemic, costs and losses that are mounting every day.

44.    As examples of its rising costs, Northwell has incurred substantial costs in cleaning supplies, janitorial services, and the hiring of new employees and vendors alike to keep Northwell's premises safe and sanitized.

45.    While the losses have taken many forms, the most significant driver of Northwell's losses have been the forced cessation of elective surgeries, the closing of physician's practices,

---

[5] World Health Organization, *Coronavirus Disease (COVID-19): how is it transmitted?*, available at   https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/coronavirus-disease-covid-19-how-is-it-transmitted (last accessed on February 1, 2021).

and fewer hospital admissions and visits to or uses of Northwell's other medical facilities due to the pandemic.

46.     Northwell has treated COVID-19 patients at multiple locations and suffered distinct losses at its multiple properties.

47.     Northwell has confronted the multiple waves of COVID-19 and responded to evolving and changing government orders and directives addressing COVID-19 and Northwell's response.

48.     Northwell has also responded to the evolving strains of COVID-19, including the new strain of COVID-19 detected in early December 2020 and expects that its costs and losses will only continue to rise.

**IV.     The Policies**

49.     In exchange for a substantial premium, Lexington sold Northwell an "All Risks" Commercial Property Insurance Policy No. 025032100 for policy period March 1, 2018 to March 1, 2021 (the "Lexington Policy").  Lexington Policy at 3 of 98.   The Lexington Policy is attached hereto as Exhibit 1.

50.     Likewise, Interstate sold Northwell an "All Risks" Commercial Property Policy No. RTX200112 18 for the policy period March 1, 2018 to March 1, 2021 (the "Interstate Policy"). Interstate Policy at 4 of 101.  The Interstate Policy is attached hereto as Exhibit 2.

51.     The Policy Limit is $1.25 billion in the aggregate, with Lexington covering 90% and Interstate covering 10% on a quota share basis, subject to a $500,000 combined coverages deductible per Occurrence.

52.     Both Policies follow the same common form and endorsements.

53.     The Policies are designed to cover exactly the type of costs and losses Northwell has suffered due to the COVID-19 pandemic: costs expended to decontaminate its properties, and losses due to interruption by communicable disease, and costs and losses arising out of the physical loss of its property or damage to its property.

54.     Unless damage is clearly included within a listed Limit of Liability, the Policy Limit of the Policies is available for Northwell's damages.  Lexington Policy at 12 of 98; Interstate Policy at 13 of 101.

55.     The Limits of Liability in the Policies are on a per occurrence basis.  Lexington Policy at 12 of 98; Interstate Policy at 13 of 101.

56.     "Occurrence" is defined as "any one loss, disaster, casualty, or series of losses, disasters, or casualties, arising out of one event."  Lexington Policy at 87 of 98; Interstate Policy at 89 of 101.

57.     The Policies contain a broad grant of coverage for property damage and time element coverage, stating that they cover "all risks of direct physical loss of or damage from any cause unless excluded."  Lexington Policy at 58 of 98; Interstate Policy at 60 of 101.

58.     The Policies' Time Element coverage provides:

The Company will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at an Insured Location. The **Suspension** must be due to direct physical loss of or damage to Covered Property (of the type insurable under this Policy other than **Finished Stock**) caused by a **Covered Cause of Loss**.

The Company will also pay for the actual Time Element loss sustained by the Insured, during the Period of Liability at other Insured Locations. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at the other Insured Locations. Such other Location must depend on the continuation of business activities at the Location that sustained direct physical loss or damage caused by a **Covered Cause of Loss**.

Lexington Policy at 21 of 98; Interstate Policy at 23 of 101.

59.     **Suspension** is defined as "The slowdown or cessation of the Insured's business activities; or [a]s respects rental income that part or all of the Insured Location is rendered untenantable."  Lexington Policy at 63 of 98; Interstate Policy at 65 of 101.

60.     **Covered Cause of Loss** is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded."  Lexington Policy at 58 of 98; Interstate Policy at 60 of 101.

61.     As part of the Policies' Time Element coverage, the Policies cover Northwell's Gross Earnings and Extra Expenses.

62.     Gross Earnings include the sum of (i) in-patient services, out-patient services, and ambulance services; (ii) total net sales of merchandise; (iii) rental income; and (iv) other income derived from Northwell's business activities.  Subtracted from Gross Earnings are (i) contractual adjustments, bad debt, free services or any other discounts; (ii) supplies consisting of materials consumed directly in supplying the service(s) sold by Northwell; (iii) merchandise sold; and (iv) service(s) purchased from outsiders for resale, which do not continue under contract.  Lexington Policy at 22 of 98; Interstate Fire & Casualty Policy at 24 of 101.

63.     The Declarations page does not list a sublimit for Gross Earnings.

64.     "Extra Expenses" mean "that amount spent to continue the Insured's business activities over and above the expenses the Insured would have normally incurred had there been no direct physical loss of or damage caused by a Covered Cause of Loss to Property of the type insurable under this policy at a Location."  Lexington Policy at 23 of 98.  Interstate Policy at 25 of 101.

65.     For each occurrence, Extra Expense coverage is subject to a $500,000,000 sublimit.

66. The Policies also include several specific special coverages with per occurrence sublimits, including but not limited to:

| Special Coverage | Per Occurrence Sublimit |
|---|---|
| Interruption by Communicable Disease | $25 million |
| Decontamination Costs | $25 million |
| Civil or Military Authority | $50 million |
| Ingress/Egress | $50 million |

67. The Policies specifically recognize that the presence of a communicable disease causes direct physical loss of or damage to property, and as such is a "special coverage" insured against. Specifically, the Policies provide:

The Company will pay for the actual Gross Earnings loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases and that such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease, prohibiting access to those portions of the **Location**.

This Policy also covers the reasonable and necessary cost incurred for the cleanup, removal and disposal of the actual not suspected presence of substances(s) causing the spread of such communicable disease and to restore the locations in a manner so as to satisfy such authorized governmental agency.

This Coverage will only apply when the period of time that access is prohibited exceeds the time shown as **Qualifying Period** in the **Qualifying Period** clause of the Declarations section. If the Qualifying Period is exceeded, then this Policy will pay for the amount of loss in excess of the Policy Deductible, but not to exceed the number of consecutive days following such order as stated in the Declarations up to the limit applying to this Coverage.

This Coverage will not apply to loss or damage that is payable under any other provision in this Policy.

Lexington Policy at 41 of 98; Interstate Policy at 43 of 101.[6]

---

[6] The "Qualifying Period" for interruption by communicable disease is 24 hours. Lexington Policy at 14 of 98; Interstate Policy at 16 of 101.

68.     For each occurrence, the Interruption by Communicable Disease special coverage is subject to a $25 million sublimit and 30-day time limitation.

69.     The Policies also cover Northwell's "Decontamination Costs" as follows:

> If Covered Property is **Contaminated** from direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property and there is in force at the time of the loss any law or ordinance regulating **Contamination** due to the actual not suspected presence of **Contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such **Contaminated** Covered Property in a manner to satisfy such law or ordinance. This Coverage applies only to that part of Covered Property so Contaminated due to the actual not suspected presence of Contaminant(s) as a result of direct physical loss or damage. The Company is not liable for the costs required for removing **Contaminated** uninsured property nor the **Contaminant** therein or thereon, whether or not the **Contamination** results from a **Covered Cause of Loss**.

Lexington Policy at 30 of 98; Interstate policy at 32 of 101.

70.     **Contamination** and **Contaminated** are defined as: "Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, **Fungus**, mold or mildew."  Lexington Policy at 58 of 98; Interstate Policy at 32 of 101.

71.     **Contaminant(s)** are defined as: "Any solid, liquid, gaseous, thermal or other irritant, pollutant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, other hazardous substances, **Fungus** or **Spores**."  Lexington Policy at 58 of 98; Interstate Policy at 32 of 101.

72.     For each occurrence, the Decontamination Costs special coverage is subject to a $25 million sublimit.

73.     The Policies provide coverage for "Civil or Military Authority."  Specifically, the Policies provide:

16

The Company will pay for the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**. That order must result from a civil authority's response to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured's Location as stated in the Declarations. The Company will pay for the actual Time Element loss sustained, subject to the deductible provisions that would have applied had the physical loss or damage occurred at the Insured Location, during the time the order remains in effect, but not to exceed the number of consecutive days following such order as stated in the Declarations up to the limit applying to this Coverage.

Lexington Policy at 27 of 98; Interstate Policy at 29 of 101.

74.     For each occurrence, the Civil or Military Authority special coverage is subject to a $50 million sublimit, 90-day time limitation, and 5 mile distance limitation.  Lexington Policy at 13 of 98; Interstate Policy at 15 of 101.

75.     The Policies' "Ingress/Egress" special coverage provides:

The Company will pay for the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers or employees is prevented by physical obstruction due to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured Location as stated in the Declarations. The Company will pay for the actual Time Element loss sustained, subject to the deductible provisions that would have applied had the physical loss or damage occurred at the Insured Location, during the time ingress or egress remains prevented by physical obstruction but not to exceed the number of consecutive days as stated in the Declarations following such obstruction up to the limit applying to this Coverage.

Lexington Policy at 32 of 98; Interstate Policy at 34 of 101.

76.     For each occurrence, the Ingress/Egress special coverage is subject to a $50 million sublimit, 90-day time limitation, and 5 mile distance limitation.  Lexington Policy at 13 of 98; Interstate Policy at 15 of 101.

77.     The Policies contain numerous other special coverages that may cover Northwell's ongoing costs and losses as it continues to battle COVID-19, including: Contingent Time Element, Expediting Costs, Professional Fees, Protection and Preservation of Property, Research and Development, Tenants Prohibited Access, Mobile Medical Equipment, Protection of Patients, Professional Employment Replacement Expense, and Logistics Extra Cost.

78.     The properties where Northwell has sustained costs and losses are insured properties under the Policies, and the insured damages include Northwell's loss of gross earnings, extra expense, and increased costs.

79.     Operating a network of healthcare facilities, Northwell understood that it would be on the front lines in the event of a pandemic such as COVID-19, and it reasonably expected that the Policies would cover such losses arising from such a pandemic.  Northwell's reasonable expectation is based upon, among other things, the broad language in the Policies, the express coverage for losses resulting from communicable disease, the express coverage for decontamination costs, and the fact that the Policies do not contain language excluding losses resulting from viruses or diseases.  Indeed, Northwell's Enterprise Risk Management plans reflect its intention that the Policies would provide coverage for costs and losses arising out of pandemics like the one it is currently facing.

80.     Moreover, none of the Policies' exclusions preclude Northwell's claim for coverage.  Rather, the "Pollution, Contamination, Debris Removal" exclusion endorsement, which Defendants claim erases Northwell's coverage for communicable disease and decontamination costs, only applies to traditional environmental and industrial pollution.  It has no effect on claims arising from the presence of the novel coronavirus at Northwell's properties, the constant imminent threat of its presence, or the associated government action or inaction in response to the pandemic.

18

81.    Northwell has paid all premiums due to Defendants to purchase the Policies, complied with all applicable duties under the Policies, and satisfied the applicable deductible.

**V.    Northwell's Claim to Defendants**

82.    In April 2020, during the early height of COVID-19's presence in the New York metropolitan area, Northwell gave prompt notice of its claim to Defendants.  Through their adjuster, Defendants reserved their rights and requested additional information, but did not indicate whether they would cover any portion of Northwell's claim under any of the Policies' coverages. Northwell promptly responded to all Defendants' requests for information.

83.    On October 30, 2020, over 6 months after Northwell noticed its claim, Defendants sent Northwell a letter stating their "preliminary determination" was that there was no coverage for Northwell's claim.  The October 30 letter only addressed the Interruption by Communicable Disease, Decontamination Costs, and Civil or Military Authority coverage.  The letter ignored that Northwell has incurred costs and losses as a result of direct physical loss of or damage to its property.

84.    In the October 30 letter, Defendants acknowledged that Northwell's manuscript policy form specifically included coverages for Interruption by Communicable Disease and Decontamination Costs.  However, Defendants took the position that Endorsement #003, the Policies' "Pollution, Contamination, Debris Removal Exclusion" erased these coverages.

85.    The "Pollution, Contamination, Debris Removal Exclusion" makes no reference to the Policies' special coverages for Interruption by Communicable Disease or Decontamination Costs, much less does it state that it eliminates those special coverages.  The notion that Defendants unilaterally eliminated a health care system's bargained for coverages for Interruption by Communicable Disease and Decontamination Costs via endorsement, and that they would take

this position as Northwell faces the worst public health crisis in over a century, demonstrates the unreasonableness of Defendants' position.

86.     The "Pollution, Contamination, Debris Removal Exclusion" does not apply to Northwell's costs and losses.  The exclusion confirms that excluded damages must result from the "release, discharge, dispersal, escape or dispersal" of pollutants or contaminants, which are defined to be those substances regulated by specified environmental statutes and the United States Environmental Protection Agency.  This exclusion does not apply to Northwell's claim.

87.     As evidence that the pollution or contamination exclusion does not apply to the pandemic, in 2006, the Insurance Services Office (an insurance trade group) drafted a new endorsement, CP 01 40 07 06.  The endorsement, which other insurers have since incorporated into their policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."  Insurers have contended that this is the exclusion that prohibits losses resulting from viruses.  Defendants chose not to include this endorsement or an analogous provision in their Policies; instead, they included only the exclusion for pollution, contamination, or debris removal.

88.     Defendants also claimed that two executive orders issued by New York Governor Andrew Cuomo and one directive issued by the New York Commissioner of Health did not trigger coverage because they did not completely prohibit access to Northwell's facilities.  Here, the government orders have prohibited access to Northwell's properties and forced the closure of Northwell's non-essential businesses.  Nothing in the Policies requires the complete prohibition or total shutdown of access to Northwell's facilities for coverage.  To the contrary, "suspension" is defined as the "*slowdown or* cessation of [Northwell's] business activities."  Lexington Policy at

63 of 98; Interstate Policy at 65 of 101 (emphasis added).  None of the special coverages require a showing that an order prohibiting access to Northwell's premises must result in a total shutdown of the property.

89.     Furthermore, Defendants' position that the order prohibiting access to Northwell's facilities must result in the complete shutdown of the property defies Northwell's reasonable expectations when it purchased coverage from Defendants for a significant premium.  Hospitals and critical care facilities like the ones run by Northwell are among the few essential businesses that will always stay at least partially open during crises to serve those in need, including during pandemics like the COVID-19 pandemic.  Defendants' position that Northwell's properties must be completely shutdown by government order for communicable disease and civil authority coverage to apply renders the coverage Northwell bargained for and expected completely illusory.

90.     On December 18, 2020, Northwell sent Defendants a letter raising the above points and urging Defendants to reconsider their denial of coverage.

91.     Defendants refused to reconsider their positions, and on January 6, 2021, they reiterated their complete denial of coverage.

92.     In their responses to Northwell's claim for coverage, Defendants ignore that because COVID-19 and SARS-CoV-2 are physically present at Northwell's properties, they cause physical loss of or damage to Northwell's property.  Thus, Defendants have failed to recognize that Northwell's costs and losses are covered under the Policies' insuring agreements for Property Damage and Time Element and numerous special coverages, including, but not limited to, Contingent Time Element, Expediting Costs, Ingress/Egress, Professional Fees, Protection and Preservation of Property, Research and Development, Tenants Prohibited Access, Mobile Medical Equipment, Protection of Patients, Professional Employment Replacement Expense, and Logistics

Extra Cost.  Finally, Defendants ignore that Northwell's losses result from a number of causes other than the virus or disease, including, but not necessarily limited to, the pandemic, governmental negligence, or the Orders, all of which are other covered causes of loss under the Policies and constitute direct physical loss of Northwell's property and/or direct physical damage to Northwell's property.

93.     The October 30 and January 6 letters from Defendants sent a clear message that they do not intend to pay for all of, or indeed any of, Northwell's significant costs and losses covered under the Policies.

94.     Defendants' responses have further harmed Northwell by depriving it of the benefit of the bargain it purchased in the Policies.  Defendants' position has forced Northwell to fight a two-front battle, both against the COVID-19 pandemic, but also to obtain coverage to which it is clearly entitled.  Northwell comes to this Court to force Defendants to provide the coverage it is owed under the Policies.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

95.     Northwell repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

96.     The Lexington Policy constitutes a valid and enforceable contract between Northwell and Lexington.

97.     The Interstate Policy constitutes a valid and enforceable contract between Northwell and Interstate.

98.     As described above, Northwell has sustained, and is continuing to sustain, costs and losses covered under the Policies and during the Policy period.

99.     Northwell provided prompt notice of its costs and losses, performed all obligations required of it under the Policies, and/or was ready, willing, and able to perform its obligations under the Policies at the time Defendants stated in their October 30, 2020 letter that there was no coverage available for Northwell under the Policies.

100.    Under the terms of the Policies, Lexington must pay up to $1,125,000,000 and Interstate must pay up to $12,500,000 for any costs or losses covered under the Policies, subject only to sublimits, time limits, and/or deductibles for specific coverages.

101.    Defendants have not paid any amounts to Northwell in connection with its claim. Instead, Defendants have asserted various inapplicable bases to wrongfully deny coverage for Northwell's claim.

102.    As a direct and proximate result of Defendants' breach of contract, Northwell has suffered and will continue to suffer damages in excess of $75,000 in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

### SECOND CAUSE OF ACTION
### (Declaratory Judgment)

103.    Northwell repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

104.    Under the terms of the Policies, Lexington must pay up to $1,125,000,000 and Interstate must pay up to $12,500,000 for any costs or losses covered under the Policies, subject only to sublimits, time limits, and/or deductibles for specific coverages.

105.    As detailed above, Northwell's costs and losses are covered under the Policies and are not excluded from coverage.

106.    Defendants dispute their legal obligation to pay Northwell's claim.

107.    An actual and justiciable controversy presently exists between Northwell and Defendants concerning the proper construction of the Policies, and the rights and obligations of the parties thereto, with respect to Northwell's claim for costs and losses arising out of the coronavirus outbreak.

108.    Northwell seeks a declaratory judgment in favor of Northwell and against Defendants declaring that Northwell is entitled to coverage under the Policies.

109.    A declaratory judgment would be useful in resolving this case or controversy. Northwell's costs and losses are ongoing.  By clarifying the parties' rights and duties under the Policies, a declaratory judgment would guide Defendants' treatment of Northwell's covered, but unaccrued, costs and losses, in addition to the significant damages Northwell has already accrued. Because Northwell's accrued costs and losses have not yet ripened such that a final amount of damages can be ascertained, the declaratory judgment claim would afford Northwell relief independent of the breach of contract claim.

### THIRD CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

110.    Northwell repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

111.    The Policies are valid contracts between Northwell and Defendants.

112.    Every contract imposes upon the contracting parties the duty of good faith and fair dealing.

113.    Defendants have breached the implied covenant of good faith and fair dealing by, among other things, delaying assessment of Northwell's claim and putting forward baseless reasons why Northwell's claim is not covered, including Defendants' contention that a "pollution" exclusion added through endorsement eliminated Northwell's bargained for coverages for

Interruption by Communicable Disease and Decontamination Costs, and Defendants' baseless contention that Northwell's facilities must be completely shut down before it is entitled to coverage.

114.   Defendants have violated the standards for good faith and fair dealing set forth in New York Insurance law § 2601(a).

115.   Northwell has been damaged by Defendants' breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial.

116.   Northwell is entitled to consequential damages flowing from Defendants' violation of the implied covenant of good faith and fair dealing, including, without limitation, the attorneys' fees and costs incurred by Northwell in enforcing its rights and as a consequence of Defendants' bad faith delays in providing coverage for Northwell's claim.

117.   Consequential damages, including payment of attorneys' fees and costs, were reasonably contemplated by Northwell and Defendants at the time they entered into the Policies.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Northwell prays for relief as follows:

a.   On the First Cause of Action, Northwell requests that the Court enter judgment against Defendants, awarding Northwell damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

b.   On the Second Cause of Action, Northwell requests that the Court enter a declaratory judgment in favor of Northwell against Defendants that Northwell's costs and losses are covered under the Policies and declaring that Defendants are required to pay Northwell, up to the applicable limits, for claimed amounts under the Policies.

c.    On the Third Cause of Action, Northwell requests that the Court enter a judgment against Defendants, awarding Northwell damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

d.    For all Causes of Action, all pre-judgment and post-judgment interest as allowed by law and all costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees; and

e.    Northwell requests such other and further relief as the Court deems just and proper.

## JURY DEMAND

Northwell hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
　　　 February 8, 2021

/s/ Robin L. Cohen
Robin L. Cohen
Alexander M. Sugzda
Cynthia M. Jordano
COHEN ZIFFER FRENCHMAN &
MCKENNA LLP
1350 Avenue of the Americas, 25th Floor
New York, New York 10019
Tel: (212) 584-1890
rcohen@cohenziffer.com
asugzda@cohenziffer.com
cjordano@cohenziffer.com

*Attorneys for Plaintiff Northwell Health, Inc.*