UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NORTHWELL HEALTH, INC.,

        Plaintiff,

  -against-

LEXINGTON INSURANCE COMPANY
and INTERSTATE FIRE &
CASUALTY COMPANY,

       Defendants.

21-cv-1104 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

Plaintiff Northwell Health, Inc. ("Northwell") is a large, New York-based healthcare provider that purchased all-risk commercial property insurance policies from defendants Lexington Insurance Company ("Lexington") and Interstate Fire & Casualty Company ("Interstate") (collectively, the "Insurers"). At the onset of the COVID-19 pandemic, Northwell was inundated with new patients and burdened by increased cleaning costs. In response to state and local orders, Northwell stopped offering outpatient care services and performing elective procedures. Northwell sought reimbursement from the Insurers for its increased costs and business losses related to the pandemic, but after a six-month delay, the Insurers denied the claim. Northwell then sued the Insurers for breach of contract and breach of the implied covenant of good faith and fair dealing.

Before the Court are Insurers' motion to dismiss the Complaint for failure to state a claim and Northwell's motion for partial summary judgment. For the reasons set forth below, the Court grants the motion to dismiss and denies the motion for partial summary judgment as moot.

## BACKGROUND

### I.   Factual Background

The following factual allegations, which are taken from the Complaint and its attached exhibits, are assumed true for purposes of the motion to dismiss. See R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp., 959 F.3d 509, 512 (2d Cir. 2020).

### A.   The Policies

Northwell purchased from Lexington and Interstate two all-risks commercial property insurance policies effective from March 1, 2018 until March 1, 2021 (the "Policies"). Id. at ¶¶ 49-48. The Policies "follow the same common form and endorsements," but the Lexington policy covers 90% of the Policy Limit, while the Interstate policy covers 10% of the limit "on a quota share basis." Id. at ¶¶ 51-52.

#### 1.   Coverage

The Policies provide "Time Element" coverage for lost earnings from the necessary "suspension" of business activities at an insured location, if the suspension is caused by "direct physical loss of or damage to Covered Property . . . caused by

Covered Cause of Loss." Compl., Ex. 1, ECF No. 1-1 ("Lexington"),
at § 4.01.01; Compl., Ex. 2, ECF No. 1-2 ("Interstate"), at
§ 4.01.01. As relevant here, a suspension is defined as "[t]he
slowdown or cessation of the Insured's business activities." Id.
at § 7.59. A covered cause of loss means "[a]ll risks of direct
physical loss of or damage from any cause unless excluded." Id.
at § 7.11.

The Policies also provide four special coverages relevant
here. First, under the "Interruption by Communicable Disease"
provision, the Policies provide reimbursement for lost earnings

> resulting from the necessary Suspension of the
> Insured's business activities at an Insured
> Location if the Suspension is caused by order of an
> authorized governmental agency enforcing any law or
> ordinance regulating communicable diseases and that
> such portions of the location are declared
> uninhabitable due to the threat of the spread of
> communicable disease, prohibiting access to those
> portions of the Location.

Id. at § 5.02.36. Interruption by Communicable Disease coverage
also covers reasonable cleanup costs for the "actual not suspected
presence of substance(s) causing the spread of such communicable
disease" and any restoration costs required "to satisfy such
authorized governmental agency." Id.

Second, under the "Civil or Military Authority" provision,
the Policies provide coverage for time element loss resulting from
the suspension of business activities "caused by order of civil or
military authority that prohibits access to the Location." Id. at

§ 5.02.03. The order "must result from a civil authority's response to direct physical loss of or damage caused by a Covered Cause of Loss to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured's Location as stated in the Declarations." Id.

Third, under the "Decontamination Costs" provision, the Policies cover "the increased cost of decontamination and/or removal of . . . Contaminated Covered Property," if the insured property "is Contaminated from direct physical loss of or damage caused by a Covered Cause of Loss to Covered Property and there is in force at the time of the loss any law or ordinance regulating Contamination due to the actual not suspected presence of Contaminant(s)." Id. at § 5.02.07. Contamination is defined as "[a]ny condition of property due to the actual presence of any foreign substance, . . . pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent." Id. at § 7.09. Contaminants include "[a]ny solid, liquid, gaseous, thermal or other irritant, pollutant, or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, or other hazardous substances, Fungus or Spores." Id. at § 7.10.

Fourth, the Policies provide "Ingress/Egress" coverage for time element losses resulting from the necessary suspension of business activities at an insured location when "ingress or egress to that Insured Location by the Insured's suppliers, customers or employees is prevented by physical obstruction due to direct physical loss of or damage caused by a Covered Cause of Loss to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured Location as stated in the Declarations." Id. at § 5.02.15.

       2.   Exclusions

The Policies also contain two relevant exclusions. First, the Contamination Exclusion in the body of the Policies excludes coverage for "contamination" and "any cost due to contamination," unless the contamination or contamination costs result from direct physical loss or damage not excluded by the Policies. See id. at § 3.03.01.01. The exclusion states that the Policies will not provide coverage for Northwell's "inability to use or occupy property or any cost of making property safe or suitable for use or occupancy," except as provided in the Radioactive Contamination provisions. Id.

Second, Endorsement #003 contains a Pollution and Contamination Exclusion, which became effective on the first day of the Policy Period. See Compl., Ex. 1, ECF No. 1-1, at 79 ("Lexington Endorsement #003"); Compl., Ex. 2, ECF No. 1-2, at 81

("Interstate Endorsement #003"). The Pollution and Contamination Exclusion states that the Policies will "not cover loss or damage caused by, resulting from, contributing to, or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this policy." Lexington Endorsement #003 at ¶ 2; Interstate Endorsement #003 at ¶ 2. Contaminants or pollutants, as defined in Endorsement #003, include any "bacteria, virus, or hazardous substances as listed in the Federal Water, Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act or as designated by the U.S. Environmental Protection Agency." Lexington Endorsement #003 at ¶ 2; Interstate Endorsement #003 at ¶ 2.

B.   The Pandemic

A novel and deadly coronavirus known as SARS-CoV-2, which causes an illness known as COVID-19, was first reported in the United States in January 2020. Compl. ¶ 21-22, 26. By late February 2020, the Centers for Disease Control ("CDC") warned that COVID-19 was spreading in the United States. Id. at ¶ 23. Scientific studies and guidance from the World Health Organization ("WHO") indicated that the virus spreads through (1) close contact with an infected person, (2) "absorbing respiratory droplets when an

6

infected person talks, sneezes, or coughs," or (3) touching one's eyes, nose, or mouth after touching a surface on which the virus is present. Id. at ¶ 24. The respiratory droplets that carry the coronavirus are "physical objects, carrying a physical substance, that attach to" and allegedly "cause harm to property." Id. at ¶ 26. The novel coronavirus "can survive on a whole range of surfaces, including stainless steel, wood, paper, plastic, glass, ceramic, cardboard, and cloth" for days or weeks, and "thus compromises the physical integrity of the structures it permeates" and makes those structures "unusable." Id. at ¶¶ 36-37.

The federal government declared an emergency on March 13, 2020 in response to the spread of COVID-19. Id. at ¶ 29. New York state, where Northwell's properties are located, followed suit in mid-March, issuing "orders suspending or severely curtailing the operations of all non-essential or high risk businesses and permit[ing] residents to leave their homes only for limited purposes." Id. at ¶¶ 30-31. New York City mayor Bill de Blasio issued stay-at-home orders, including an order that stated that "the virus physically is causing property loss and damage." Id. at ¶ 32. On March 22, 2020, New York Governor Andrew Cuomo issued an executive order that closed "non-essential businesses." Id. The New York State and New York City emergency orders (the "Orders") allegedly "resulted from the physical loss of or damage to property not owned, occupied, leased or rented by Northwell within 5 miles

of Northwell's covered properties, which have the presence of COVID-19 and SARS-CoV-2." Id. at ¶ 34.

Northwell ranks "among the few essential businesses that will always stay at least partially open during crises." Id. at ¶ 89. But Northwell's properties were not unaffected by the state of emergency. As COVID-19 continued to spread through New York state, "Northwell faced an enormous amount of cases" and some of its facilities were "overflowing." Id. at ¶ 40. As of the date of the Complaint, Northwell estimates that it has cared for over 100,000 COVID-19 patients. Id. at ¶ 42. This care entailed significant new costs, including the costs of additional "cleaning supplies, janitorial services, and the hiring of new employees and vendors" to sanitize Northwell's properties. Id. at ¶ 44. Northwell sustained significant losses as well -- most notably "the forced cessation of elective surgeries, the closing of physician's practices, and fewer hospital admissions and visits to or uses of Northwell's other medical facilities." Id. at ¶ 45. The Orders allegedly "declared portions of Northwell's properties uninhabitable due to the threat of the spread of COVD-19 and prohibited access to those portions of Northwell's covered properties." Id. at ¶ 33.

C.    The Claim

In April 2020, Northwell submitted a claim to Insurers for reimbursement of its COVID-19-related costs and losses. Id. at

¶ 82. Six months later, on October 30, 2020, Insurers informed Northwell of their initial determination that Northwell's claim was not covered under the Communicable Disease, Decontamination Costs, or Civil or Military Authority provisions of the Policies. Id. at ¶¶ 13, 83. Insurers also stated that Endorsement #003 eliminated whatever coverage was provided under the Communicable Disease provisions. Id. at ¶ 84. Northwell asked Insurers to reconsider in December 2020, but Insurers reiterated in January 2020 that they would not provide coverage. Id. at ¶ 90.

II.  Procedural History

Northwell brought this action on February 8, 2021, alleging that Lexington and Interstate breached their respective insurance policies and the covenant of good faith and fair dealing by refusing to provide insurance coverage for business costs and losses related to the COVID-19 pandemic and by failing to respond to Northwell's claim in a timely manner. See ECF No. 1. Insurers moved to dismiss the Complaint for failure to state a claim. ECF No. 18. Northwell then moved for partial summary judgment on the sole issue of whether the contamination exclusion provisions apply to Time Element Coverage under the Policies. ECF No. 28.

**LEGAL STANDARD**

A plaintiff must "state a claim to relief that is plausible on its face" to survive a motion to dismiss. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim for relief is facially plausible

when the complaint goes beyond facts that are "merely consistent with" liability and "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. At the motion to dismiss stage, the Court sets aside conclusory allegations and "threadbare recitals of the elements of a cause of action," but accepts all remaining factual allegations as true and draws all reasonable inferences in the plaintiff's favor. See Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). In evaluating the plausibility of the complaint, the Court considers the insurance agreements attached to the complaint, statements and documents that the complaint incorporates by reference, and any documents that are "integral to the complaint" because the complaint "relies heavily upon [their] terms and effect." See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).

To state a claim for breach of contract under New York law, a plaintiff must plausibly allege the existence of an agreement, performance by the plaintiff, breach by the defendants, and damages. Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 177 (2d Cir. 2004). A breach of contract claim cannot rest on a conclusory statement that the defendant breached a contract. Berman v. Sugo LLC, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008). As such, allegations that merely parrot the language of the

contractual provisions alleged to be breached without providing supporting facts are not presumed true. See, e.g., Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC, 842 F. Supp. 2d 502, 508-12 (S.D.N.Y. 2012); Arma v. Buyseasons, Inc., 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008).

An insurance contract governed by New York law is interpreted "like any other contract." Traynor v. John Hancock Mut. Life Ins. Co., 7 N.E.2d 112, 114 (N.Y. 1937). Unambiguous provisions are given "their plain and ordinary meaning." Vigilant Ins. Co. v. Bear Stearns Cos., Inc., 884 N.E.2d 1044, 1047 (N.Y. 2008). An insurance contract is unambiguous when "there is no reasonable basis for a difference of opinion." White v. Cont'l Cas. Co., 878 N.E.2d 1019, 1021 (N.Y. 2007). When interpreting an insurance contract, courts consider the views of "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006). When an insurance policy "may be reasonably interpreted in two conflicting manners, its terms are ambiguous and any ambiguity must be construed in favor of the insured and against the insurer." Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co., 71 N.E.3d 556, 560 (N.Y. 2017) (internal citations and quotation marks omitted).

## DISCUSSION

This case involves "all-risk" insurance policies governed by New York law. As the name suggests, an all-risk policy "generally covers all risks of physical loss, except for those perils specifically excluded." TAG 380, LLC v. ComMet 380, Inc., 890 N.E.2d 195, 199 (N.Y. 2008). Northwell bears the burden of showing that the Policies covered the claimed cost or loss. See Morgan Stanley Grp. Inc. v. New England Ins. Co., 225 F.3d 270, 276 (2d Cir. 2000); see also Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co., 71 N.E.3d 556, 561 (N.Y. 2017) (holding that the insured bears the burden of establishing coverage "in the first instance"); Roundabout Theatre Co., Inc. v. Continental Cas. Co., 751 N.Y.S.2d 4, 5–6 (1st Dep't 2002) ("Labeling the policy as 'all-risk' does not relieve the insured of its initial burden of demonstrating a covered loss under the terms of the policy."). If Northwell demonstrates that the Policies provide coverage, the burden shifts to Insurers to "establish[] that the exclusions or exemptions apply in th[is] particular case, and that they are subject to no other reasonable interpretation." Dean v. Tower Ins. Co., 979 N.E.2d 1143, 1145 (N.Y. 2012) (quoting Seaboard Sur. Co. v. Gillette Co., 476 N.E.2d 272, 275 (N.Y. 1984)).

Thus, the Court first addresses whether any provision of the insurance contract grants coverage, construing grants of coverage broadly in favor of Northwell, the insured party. Next, the Court

considers whether Lexington and Interstate reduced that grant of coverage by exclusion or endorsement, interpreting such provisions narrowly. Finally, the Court addresses Northwell's claim for breach of the implied covenant of good faith and fair dealing.

I.   The Policies do not extend coverage to Northwell's claim.

Northwell has identified a litany of possible provisions that authorize reimbursement for its COVID-19-related costs and losses. However, Northwell's arguments for coverage under each of these provisions are unpersuasive. Specifically, Northwell fails to state a claim for breach of contract to provide Time Element coverage because these provisions require the cost or loss to be caused by direct physical loss or damage. Northwell fails to state a claim for breach of contract to provide Interruption by Communicable Disease coverage because Northwell does not plausibly allege that state and local orders regulating the spread of COVID-19 declared uninhabitable and prohibited access to Northwell facilities. Finally, Northwell also fails to state a claim for breach of contract to provide coverage under the Civil or Military Authority, Decontamination Costs, and Ingress/Egress provisions both because these special coverages require the claimed cost or loss to be caused by direct physical loss or damage and because Northwell fails to adequately plead additional, independent requirements for coverage under these provisions.

A.    Time Element Coverage

The time element provision does not grant coverage for Northwell's COVID-19-related costs and losses, because this provision requires a claimed cost or loss to be caused by a Covered Cause of Loss, meaning "direct physical loss or damage." See Lexington §§ 4.01, 7.11.

Several courts have construed the words "direct physical loss or damage" in the insurance contract context. The phrase "ordinarily connote[s] actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure." Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co., 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014).

Northwell alleges that respiratory droplets carrying the coronavirus attach to surfaces, linger there, and "thus compromise[] the physical integrity of the structures it permeates" and renders those structures "unusable." See Compl. ¶¶ 26, 36-37. However, the Complaint does not allege any facts supporting the conclusion that the coronavirus compromises the physical integrity of objects by harming surfaces and structures, as opposed to harming the people who touch them.

Northwell argues that when a physical substance permeates a property and renders the property unusable for its intended

purpose, that substance causes direct physical loss or damage. Respiratory droplets carrying SARS-CoV-2, Northwell reasons, are like the invisible fumes or noxious gas that courts have held can constitute a form of physical damage. See Newman Myers, 17 F. Supp. 3d at 329-30 (holding based on a survey of non-New York cases that the term "'physical loss or damage' does not require that the physical loss or damage be tangible, structural or even visible," only that physical forces have made the property unusable). But see Couch on Insurance, § 148:46 (3d ed. 2009) (the "physical loss" requirement is "widely held to exclude alleged losses that are intangible or incorporeal").

Northwell's argument is flawed in three respects. First, Northwell's preferred interpretation risks impermissibly collapsing coverage for direct physical loss or damage into "loss of use" coverage. See Roundabout, 751 N.Y.S.2d at 5 (N.Y. Ct. App. 2002) (holding that physical loss or damage could not include "loss of use" of the premises). Second, the coronavirus -- unlike invisible fumes and chemicals -- does not "persist" and irreversibly alter the physical condition of a property. See, e.g., Kim-Chee LLC v. Philadelphia Indem. Ins. Co., 2021 WL 1600831, at *4 (W.D.N.Y. Apr. 23, 2021) (distinguishing the novel coronavirus from other types of contaminants because the virus "is rendered harmless by the passage" of time). As the Complaint itself suggests, a property may be kept "safe and sanitized," and

therefore usable, despite the presence of SARS-CoV-2. See Compl. ¶ 44. Third, even accepting Northwell's definition of "direct physical loss or damage" to include any physical substance or force that makes a property unusable, Northwell has not plausibly alleged that the presence of COVID-19 made its properties unusable. Northwell's hospitals continued to operate with "extra precautions"; their functions were not destroyed, nor were they declared unsafe to enter. See id. at ¶¶ 38, 41-44.

The cases that Northwell cites are distinguishable along these lines. Schlamm Stone & Dolan, LLP v. Seneca Insurance Co., 2005 WL 600021, at *1 (N.Y. Sup. Ct. Mar. 4, 2005), concerned the "dust and particles which remained" in the carpets of an office building near the World Trade Center after the September 11 terrorist attacks and caused office workers to experience respiratory distress. Id. at *1, 4. Plaintiffs there alleged that "despite cleaning carpets, airshafts, furniture and surfaces," the particles "persisted" and "made it difficult to remain in the offices" for more than "a few hours a day." Id. at *1. The Court therefore concluded that the Complaint plausibly alleged physical loss or damage. Id. at *4. This case, however, involves property that may be "ke[pt] . . . safe and sanitized" with "cleaning supplies" and "janitorial services." See Compl. ¶ 44. Because SARS-CoV-2 can be "eliminated through routine cleaning and disinfection," the surfaces on which the virus lands are not

physically damaged or lost. Food for Thought Caterers Corp. v. Sentinel Ins. Co., 2021 WL 860345, at *5 (S.D.N.Y. Mar. 6, 2021) (citing Tappo of Buffalo, LLC v. Erie Ins. Co., 2020 WL 7867553, at *4 (W.D.N.Y. Dec. 29, 2020)).

Gregory Packaging, Inc. v. Travelers Property Casualty Company, 2014 WL 6675934, at *1 (D.N.J. Nov. 25, 2014) (unreported) dealt with the release of ammonia from a refrigeration system into a factory. The parties agreed that "the ammonia rendered the building temporarily unfit for occupancy and use" where "the building was "evacuated . . . for a mile radius" and "no one could enter the building." Id. at *3. Accordingly, the district court found as a matter of law that the ammonia release constituted "direct physical loss of or damage." In contrast, doctors, patients, and vendors alike continue to enter and use Northwell's healthcare facilities. See Compl. ¶¶ 40-44.

Finally, Port Authority of New York & New Jersey v. Affiliated FM Insurance Co., 311 F.3d 226 (3d Cir. 2002), harms rather than helps Northwell's position. In Port Authority, the Third Circuit held that when "asbestos is present in components of a structure, but is not in such form or quantity as to make the building unusable, the owner has not suffered a loss," because "[t]he structure continues to function -- it has not lost its utility." Id. at 236. Intangible or particulate matter must "contaminat[e] of the property such that its function is nearly eliminated or

destroyed, or the structure is made useless or uninhabitable." Id. Though the plaintiffs in Port Authority demonstrated the presence of asbestos in insured buildings, the asbestos did not cause direct physical loss or damage as a matter of law because "those buildings had continuous and uninterrupted usage for many years." Id. Northwell has not alleged that the functions of its properties were nearly eliminated. A hospital does not cease to function as a hospital because a viral outbreak requires more staff or an increase in the hospital's use of hygiene practices, personal protective equipment, or janitorial services. See Compl. ¶¶ 41, 44.

This Court concludes that the Complaint does not plausibly allege that the presence of COVID-19 constitutes direct physical loss or damage to Northwell's properties, and accordingly, Northwell fails to state a claim for breach of contract to provide Time Element coverage.

B.   Interruption by Communicable Disease Coverage

Northwell is entitled to reimbursement under the Interruption by Communicable Disease provision if (1) Northwell ceased or slowed down business activities at an insured location (2) because an authorized government agency regulating the spread of a communicable disease issued an order (3) that declared portions of the location "uninhabitable" because of the threat of disease and

"prohibit[ed] access to those portions." Lexington §§ 5.02.36, 7.59.

With respect to the first element, Northwell plausibly alleges that Northwell stopped or slowed activities at certain insured locations. The Complaint states that "the most significant driver of Northwell's losses [was] the closing of physician's practices," thereby alleging that certain insured locations ceased their business activities. Compl. ¶ 45. Insurers argue that because Northwell was "inundated" with COVID patients, Northwell's business activities increased overall, albeit with a different and perhaps less lucrative mix of services. But the Policies do not require the suspension of business activities across the Northwell healthcare system, only that business activities cease or slow down at a particular insured location.

The Complaint also clearly satisfies the second element by alleging that authorized government agencies -- namely, the Office of the Governor of the State of New York and Office of the Mayor of New York City -- issued orders regulating the spread of the novel coronavirus, a communicable disease. See id. at ¶¶ 29-34.

At the third element, however, Northwell stumbles. The Complaint alleges that a series of state and local lockdown orders "declared portions of Northwell's properties uninhabitable due to the threat of the spread of COVID-19 and prohibited access to those portions of Northwell's covered properties." Id. at ¶ 33. This

allegation simply recites in a conclusory fashion the policy language that would entitle Northwell to coverage and, accordingly, cannot be presumed true. See, e.g., Soroof Trading, 842 F. Supp. 2d at 508, 512 (requiring dates or details to make plausible the allegation that defendant "fail[ed] to share promptly relevant information, including but not limited to product performance, failure and liability issues," when the agreement required defendant to "share promptly relevant information."); Arma v. Buyseasons, Inc., 591 F. Supp. 2d at 643 (S.D.N.Y. 2008) (finding conclusory allegations that tracked contractual language without particular supporting facts). Northwell does not lend its assertions the ring of plausibility by adding factual enhancements that elevate its coverage claim above "a formulaic recitation of the elements of a cause of action." Iqbal, 556 U.S. 662, 672 (2009).

Further, the executive orders upon which Northwell relies in its complaint, see Compl. ¶ 31–32, do not support Northwell's argument for coverage under the Interruption by Communicable Disease provision.[1] In Governor Cuomo's Emergency Executive Order,

---

[1] Because the Complaint relies upon the terms and effects of the Orders, the Court may consider them without converting the motion to dismiss into a motion for summary judgment. See Chambers, 282 F.3d at 153.

the Governor authorized the Department of Health to promulgate regulations concerning the treatment and containment of COVID-19 in hospitals. See Cohen Decl., Ex. 4, ECF No. 26-4. The New York Department of Health then directed hospitals to suspend all visitation except by the family members or legal representatives of patients, unless medically necessary. See id. The Department of Health also provided guidelines on how "support people" could interact with patients and required that a "patient support person" be given access to hospital facilities to interact with patients in labor, pediatric patients, and patients with cognitive disabilities. Id. In Mayor DeBlasio's executive order, the mayor directed hospitals and emergency centers to "cancel or postpone elective procedures," defining elective procedures to include all scheduled procedures. See id.

These orders do not deem uninhabitable or prohibit access to Northwell's facilities -- or any healthcare facility, for that matter. To the contrary, the Orders assume that patients will continue to "inhabit" hospitals, regulate the way patients can safely do so, and establish conditions under which members of the public may access hospitals and patients. The Orders do not require hospitals to close certain buildings, only to suspend elective procedures; if a hospital wanted to use facilities ordinarily used for elective procedures to conduct emergency ones, nothing in the Orders forbids this. While the Orders certainly restrict access to

hospitals, they fall far short of "prohibiting" access. Accordingly, the Court finds that Northwell has failed to establish that Interruption by Communicable Disease coverage extends to Northwell's claim.

### C.   Civil or Military Authority, Decontamination Costs, and Ingress/Egress Coverage

Northwell also fails to plausibly allege that its claim is covered under the Civil or Military Authority, Decontamination Costs, and Ingress/Egress provisions for two independent reasons. First, each of these provisions require Northwell's costs and losses to be caused "physical loss or damage." See Lexington §§ 5.02.02, 5.02.07, 5.02.15. As discussed above, Northwell does not plausibly allege that COVID-19 causes physical loss or damage. But even accepting that the novel coronavirus caused physical harm to property, Northwell does not satisfy the requirements of coverage under these provisions.

Civil or Military Authority coverage requires two things. First, a civil or military authority must issue an order prohibiting access to the insured location. Second, that order must be in response to physical loss or damage to nearby property not owned, occupied, lease, or rented by the insured. Lexington § 5.02.03. For instance, if a scaffold on a building neighboring a Northwell facility collapsed and in response the city ordered the buildings on that street to close, see, e.g., Roundabout

Theatre Co., Inc. v. Continental Cas. Co., 751 N.Y.S.2d 4, 5 (N.Y. Ct. App. 2002), Northwell might be entitled to coverage under the Civil or Military Authority provisions. However, the Complaint does not allege with any specificity what nearby locations not owned by Northwell suffered physical loss or damage that caused the state or city to prohibit access to Northwell locations. Moreover, the facts alleged do not support the inference that any order prohibited access to Northwell's facilities.

Decontamination Costs coverage applies when an insured property "is Contaminated from direct physical loss of or damage caused by a Covered Cause of Loss" and a law or regulation forces the insured to incur extra costs of decontamination and removal of contaminated property. Lexington § 5.02.07. Contamination includes "the actual presence of any . . . pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent." Lexington § 7.09. Taken together, these provisions mean that the Insurers will cover the additional, government-mandated costs to remove a virus or infected property, if the presence of an illness-causing agent was caused by physical loss or damage. For example, if a bolt of lightning struck a vat of hazardous waste, the cleanup costs from the resulting spill would be covered. Northwell does not plausibly allege that the presence of the SARS-CoV-2 virus is itself caused by physical loss or damage. Instead, the Complaint explains that the presence of SARS-CoV-2 in Northwell's hospitals

is caused by infected patients and visitors who release into the air respiratory droplets containing the virus. <u>See</u> Compl. ¶ 26.

Finally, Ingress/Egress coverage requires a "physical obstruction due to direct physical loss of or damage caused by a Covered Cause of Loss." Lexington § 5.02.15. Northwell argues that the Complaint alleges obstruction to their facilities: the lockdown orders. But these orders are legal obstructions, not physical barriers preventing access to Northwell's buildings. Northwell's interpretation would strike the word "physical" from the contract.

II. <u>Exclusions</u>

Even if Northwell were entitled to coverage under one of the various provisions already discussed, Endorsement #003 unambiguously excludes coverage. Endorsement #003 "modifies insurance provided by the Policy." Endorsement #003, at 1. When faced with such language, "the endorsement and the policy must be read together, and the words of the policy remain in full force and effect except as altered by the words of the endorsement." <u>Cty. of Columbia v. Cont'l Ins. Co.</u>, 634 N.E.2d 946, 950 (N.Y. 1994).

Endorsement #003 states that the Insurers will not cover "loss or damage caused by . . . actual, alleged or threatened release, discharge, escape or dispersal" of "contaminations or pollutants," and defines contamination to include disease-causing

microorganisms, bacteria, and viruses. Northwell argues that, because Endorsement #003 refers to release and discharge, it excludes only costs and losses caused by a virus's escape from a container, such as a test tube in a lab. This argument is undermined by Northwell's own pleadings. According to the Complaint, COVID-19 is spread by the respiratory droplets emitted "when an infected person talks, sneezes, or coughs." Compl. ¶ 24. What is a sneeze or cough if not a discharge or dispersal?

Northwell claims that because "discharge" and "dispersal" are often used in pollution clauses that address only environmental or industrial substances, the Court should treat the word "virus" in the clause as if it were not there. In Belt Painting Corp. v. TIG Ins. Co., 795 N.E.2d 15 (N.Y. 2003), the New York Court of Appeals noted that the terms "discharge" and "dispersal" are terms of art in environmental law "used with reference to damage or injury caused by disposal or containment of hazardous waste" and thus found that paint fumes that "drifted a short distance from the area of the insured's intended use" were not pollutants. Id. at 18. The Court emphasized that the terms "discharge, dispersal, seepage, migration, release or escape" have "environmental implications" that cannot be overcome by the absence of a clause stating that pollutants must escape into land or water to trigger coverage. Id. Northwell argues that the clause here should be

similarly limited to environmental or industrial pollutants and contaminants.

But unlike the policy in Belt Painting, the Policies contain endorsements that define contaminants to include viruses. Grouping viruses with environmental and industrial pollutants may be unorthodox, but Northwell cites no controlling cases construing "contamination" not to include one of the terms in its contractual definition. A court may not interpret an insurance contract in a way that leaves part of the contract meaningless. Insurance Co. of N. Am. v. ABB Power Generation, Inc., 925 F. Supp. 1053, 1058–59 (S.D.N.Y. 1996). The Court declines to rewrite the unambiguous provision at issue here.

For the foregoing reasons, Northwell fails to state a claim for breach of the insurance contracts here at issue.

III. Breach of the Covenant of Good Faith and Fair Dealing

To show that an insurance company "is liable for bad faith conduct, plaintiff must plead facts supporting the inference that [the insurer] breached a duty to plaintiff that existed independently of the insurance contract." Binder v. Nat'l Life of Vt., 2003 WL 21180417, at *5 (S.D.N.Y. May 20, 2003). Northwell fails to do so here.

Northwell alleges that Insurers violated the standards for good faith and fair dealing set forth in New York Insurance Law § 2601 by offering meritless reasons for the denial of coverage

and delaying assessment of Northwell's claim. See Compl. ¶ 113-14. New York Insurance Law § 2601 prohibits insurers from engaging in the "unfair claim settlement practices" of knowingly mispresenting facts or policy provisions and "failing to acknowledge with reasonable promptness pertinent communications as to claims." N.Y. Ins. L. § 2601 (a)(1)-(2). Northwell argues that Insurers violated the duty of good faith and fair dealing by offering the same colorable reasons for denying coverage that Insurers advance on their motion to dismiss. This argument rehashes Northwell's breach of contract claims, which warrants dismissal of the claim as duplicative, unless Northwell alleges that Insurers violated a duty that is independent of the insurance contract. See Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002) (affirming dismissal of good faith and fair dealing claim as duplicative of breach of contract in insurance dispute).

If properly pled, Northwell's six-month delay responding to the notice of claim might possibly implicate an independent duty. However, Northwell has stated no facts from which the Court can infer that the delay had no basis or was unreasonable, and Northwell has identified no applicable law that required Insurers to provide a faster response. The unfair claims settlement statute that Northwell cites addresses how insurance companies must conduct themselves in settling claims against the insured, not in handling claims for reimbursement that the insurance company

receives from the insured. <u>See</u> <u>Harris</u>, 310 F.3d at 80 (explaining that the statute concerns settlement offers that could reduce an insured's liability to an excess insurer, or settlement offers in lawsuits brought by a third party against the insured). Thus, Northwell fails to state a claim for breach of the implied covenant of good faith and fair dealing.

**CONCLUSION**

For the foregoing reasons, the motion to dismiss is granted and the Complaint is dismissed with prejudice, and Northwell's motion for summary judgment is denied as moot. The Clerk of Court is directed to enter judgment.

SO ORDERED.

Dated:    New York, NY

July 26, 2021                    JED S. RAKOFF, U.S.D.J.